**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA,**
**NORFOLK DIVISION**

```
------------------------------------------------------------------X
                                                        :
INTERNATIONAL LONGSHOREMEN'S                            :
ASSOCIATION,                                            :
                                                        :
                                                        :
                                                        :
                        Plaintiff                       :
                                                        :
            v.                                          :   Civil Action No.: 2:26-cv-00366
                                                        :
VIRGINIA PORT AUTHORITY, SARAH McCOY,                  :
in her official capacity as CEO and Executive          :
Director of the Virginia Port Authority, and           :
VIRGINIA INTERNATIONAL TERMINALS,                      :
LLC,                                                    :
                        Defendants.                     :
------------------------------------------------------------------X
```

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT VIRGINIA**
**INTERNATIONAL TERMINAL'S MOTION TO DISMISS COMPLAINT**

Plaintiff International Longshoremen's Association ("Plaintiff" or "ILA") submits this memorandum of law in opposition to Defendant Virginia International Terminal's ("VIT") motion to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6).

**INTRODUCTION**

Despite what VIT repeatedly argues in its brief, this is a case about federal preemption of state conduct – it is not a suit for breach of a collective bargaining agreement. It is perhaps understandable that VIT would want to pretend otherwise, because it is easier to just argue that any contractual disputes must be resolved by the contractual remedies agreed to by the bargaining

1003-656
153923

parties; however, that point is completely undisputed by the ILA.  As a result, VIT's motion gives short shrift to the important preemption issues raised by ILA's Complaint.

The Complaint alleges that VIT and Defendant Virginia Port Authority ("VPA") have been using VPA's status as a "public instrumentality" of the Commonwealth of Virginia (*see* Va. Code Ann. § 62.1-128) to interfere with collective bargaining between VIT and the ILA.  Specifically, VPA has taken control over certain terms and conditions of employment that are covered by the coastwide collective bargaining agreement (*i.e.*, the "Master Contract") between the ILA and the United States Maritime Alliance, Ltd. ("USMX"), a multi-employer management group comprised of ocean carriers, stevedores, and marine terminal operators ("MTOs").  Moreover, VIT has willingly acquiesced in ceding control to VPA over these aspects of the workplace in the Port of Virginia.  In particular, the Complaint alleges that VPA has inserted itself and interfered with an ongoing contractual dispute involving automation and new technology by first taking plenary control over the selection, acquisition, customization, and implementation of automation in the workplace,  and then presenting the results as a *fait accompli* to both the ILA and VIT.  In this way, both VIT and VPA are able to avoid the Master Contract's detailed collaborative process that was supposed to accompany the selection, acquisition, customization, and implementation of automation that eliminates jobs. When the ILA points out the contractual transgressions, VIT responds that it has absolutely no control over the type of equipment or software that may be acquired and implemented to replace longshoremen's jobs, whereas VPA simply says that it is not bound by the Master Contract.

In fact, VIT's arguments only serve to highlight how both defendants have collectively been able to use their public/private status to avoid rules under the Master Contract as well as rules that apply to all private employers under the National Labor Relations Act ("NLRA").  In that

1003-656
153923                                           2

regard, VIT repeatedly argues that this dispute does not "belong" in federal court but, instead, should be in front of an arbitrator or before the National Labor Relations Board ("NLRB").  In doing so, VIT also admits that VPA is not a signatory to the Master Contract, nor is it subject to the jurisdiction of the NLRB.  Hence, federal court is the ILA's only recourse.

Because of the collective efforts of VPA and VIT to upset the balance of power between labor and management that Congress intended when it enacted the NLRA, this Court can order VIT and VPA to cease that arrangement, and that is precisely what this lawsuit requests.

### STATEMENT OF FACTS

The full facts surrounding Plaintiff's claims concerning Defendants' interference with their federally protected rights are set forth in Plaintiff's Complaint (Dkt. No. 1), which is incorporated herein by reference.  A brief summary follows:

Plaintiff International Longshoremen's Association is an unincorporated association and an international labor union, with its principal office located at 5000 West Side Avenue, North Bergen, Hudson County, New Jersey.  *See* Compl., ¶ 1. Defendant Virginia Port Authority exists pursuant to statute as an "public instrumentality" of the Commonwealth of Virginia. Va. Code Ann. § 62.1-128.  *Id.*, ¶ 2. Defendant Virginia International Terminals, LLC serves as VPA's private terminal operating company, providing terminal management services to Virginia International Gateway ("VIG"), Newport News Marine Terminal, Norfolk International Terminals, Portsmouth Marine Terminal, Richmond Marine Terminal and the Virginia Inland Port, which includes, but is not limited to, acquiring, installing, and/or implementing cargo-handling equipment and the semi-automated programs that are embedded in the equipment.  *Id.*, ¶ 4.

VIT acts as the record employer for the longshore workers and other maritime workers who are in the coastwide bargaining unit represented by the ILA.  *Id.*, ¶ 21.  VPA created VIT

1003-656
153923                                   3

specifically to administer the daily operations of the marine terminals at the Port of Virginia. *Id.*, ¶ 19. The creation of VIT was deemed necessary under state law because Section 40.1-57.2 of the Virginia Code prohibits state agencies from recognizing "any labor union or other employee association as a bargaining agent of any public officers or employees, or to collectively bargain or enter into any collective bargaining contract with any such union or association or its agents. *Id.*

VIT is an employer-member of the USMX, which is a multi-employer management group that is comprised of ocean carriers, marine terminal operators, and stevedores. *Id.*, ¶ 24. Together with the ILA, USMX acts on behalf of the employers to negotiate and administer the coastwide multi-port, multi-employer collective bargaining agreement, known as the "Master Contract," that governs the terms and conditions of employment for longshore workers and related crafts in the coastwide bargaining unit from Maine to Texas. *Id.*, ¶ 25. VIT is a signatory to the Master Contract and participated in the negotiations for the current Master Contract. *Id.*, ¶¶ 26-27. VPA is not a signatory to the Master Contract and, by virtue of state law under Section 40.1-57.2 of the Virginia Code, cannot be a signatory to the Master Contract. *Id.*, ¶ 28.

The Complaint further alleges that the ILA and its affiliated local unions in the Port of Virginia have recently had a contentious relationship with VIT, with much of that contention stemming from the recent practice of unilaterally acquiring, installing, and implementing new automated technology that reduces jobs and job functions without collectively bargaining, as required by the terms of the Master Contract. *Id.*, ¶¶ 29-30.

The Complaint recounts the history over the past decade whereby VIT and VPA have collectively used technology and automation to eliminate longshoremen's jobs, even while pretending to bargain in good faith: "VIT had purported to furnish a notice of new technology to the ILA," but the ILA realized only after the fact that "VIT's alleged notice had failed to disclose

the details regarding the automation software that would be installed on the new equipment which, in turn, adversely affected the ILA workforce by reducing jobs and job functions." *Id.*, ¶ 39.

More recently, automated cargo-handling equipment was acquired, installed, and implemented without notice to the ILA and without an opportunity to bargain about the potential effects to the terms and conditions of employment to ILA labor and without an opportunity to bargain about workforce protections in accordance with the Master Contract. *Id.*, ¶ 71.

The Complaint alleges that, when ILA representatives confronted VIT about the implementation of automated equipment without proper notice or bargaining, representatives from VIT told the ILA that VIT had absolutely no control over the acquisition, installation, or implementation of any new automated equipment, software, or other new technology because that aspect of the workplace was entirely controlled by VPA alone without any meaningful input from VIT. *Id.*, ¶¶ 69-70. It turns out that VPA used "its statutory authority and status as an owner-operator port authority to insert itself into and interfere with a private-sector collective bargaining relationship." *Id.*, ¶ 74.

The ILA further alleges that "VPA is acquiring, installing and implementing new technology for VIT so that VIT can avoid its contractual obligations to bargain about the acquisition and implementation of new technology" while VIT acquiesced as VPA took over important aspects of its role as an employer under the Master Contract. *Id.*, ¶ 75. The new equipment arrives replete with automated technology that adversely affects ILA labor:

> New cargo-handling equipment is becoming increasingly automated, thereby reducing job functions for the human operator. This automation is achieved largely through computer software and related job-reducing technology so that, even though the external appearance of the equipment may look similar to the same equipment from decades ago, the new technology utilizes automated processes to reduce human intervention, which has a devastating effect on port jobs. The prevalence of such job-reducing technology has accelerated in recent years and is expected to

> continue to increase over the next decade, not only in the Port of Virginia, but also in other ports throughout the stream of commerce.

With more job-reducing automated technology scheduled to arrive at the North Berth of the Port of Virginia in mid-2027 and detailed expansion plans meticulously arranged over the next 40 years, as detailed in the VPA's "Master Plan" (*see id.*, ¶¶ 77-80), the ILA seeks this Court's assistance to prevent any further interference with the terms and conditions of employment for ILA labor in the Port of Virginia.

## I.

## <u>LEGAL STANDARDS</u>

### A.  <u>Rule 12(b)(1) of the Federal Rules of Civil Procedure</u>

Where a Rule 12(b)(1) motion attacks the complaint on its face and asserts that the complaint fails to state a claim upon which subject matter jurisdiction can lie, a court assumes the truth of the facts alleged by the plaintiff, thereby functionally affording the plaintiff the same procedural protection that it would receive under Rule 12(b)(6) consideration. *See Int'l Longshoremen's Ass'n, Local 1624 v. Va. Int'l Terminals*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996). In this case, Defendants submitted their 12(b)(1) motion without any affidavits, so this is the standard that applies here.

### B.  <u>Rule 12(b)(6) of the Federal Rules of Civil Procedure</u>

The Fourth Circuit has held that a motion to dismiss under Rule 12(b)(6) should be granted only in "very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989). To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Schafer v. Citibank, N.A.*, No. 10 Civ. 10 (GBL), 2010 WL 9034653, at *3 (E.D. Va. Aug. 3, 2010) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *aff'd*, 447 F. App'x 466 (4th Cir. 2011). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 694 (E.D. Va. 2010) (*quoting Iqbal*, 556 U.S. at 678), *aff'd*, 441 F. App'x 166 (4th Cir. 2011).

A Rule 12(b)(6) motion does not resolve contests surrounding the facts or the merits of a claim. *See Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Nor does a complaint need to be factually comprehensive. *See Coleman v. Md. Ct. of Apps.*. 626 F.3d 187, 190 (4th Cir. 2010) (a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests").

Finally, in ruling on a 12(b)(6) motion, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (internal quotation marks omitted); *see also E.I. Du Pont Demours and Company v. Kolon Indus. Inc.*, 637 F.3d 435 (4th Cir. 2011) (when ruling on a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint"); *Nemet Chevrolet Ltd, v. Consumeraffairs.com. Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) ("like the district court, [we] draw all reasonable inferences in favor of the plaintiff").

## ARGUMENT

### I.

### VIT CANNOT DISPUTE THE FACTS ALLEGED IN THE COMPLAINT IN ITS RULE 12(b)(6) MOTION TO DISMISS

As a preliminary matter, VIT uses its brief to improperly argue the factual merits of the ongoing contractual dispute between VIT and the ILA. (Def. Br., pp. 7, 25). First, arguing disputed facts is unavailing at this stage on a Rule 12(b)(6) motion when a plaintiff's allegations must be

1003-656
153923                                                       7

taken as true, and the complaint must be viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citations omitted). Any statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion. *See Dolgaleva v. Va. Beach City Pub. Sch.*, 364 Fed. Appx. 820, 825 (4th Cir. 2010) (citing *Hamm v. Rhone–Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999)); *cf. Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n*, 500 F.2d 741, 744-45 (5th Cir. 1974) (treating a Rule 12(b)(6) dismissal order as converted into summary judgment because district court relied on materials outside the pleadings, including oral argument). Likewise, questions of fact cannot be resolved without "the benefit of a more complete record through discovery." *Montoya v. JH & Mercy Enter. LLC*, 1:14-cv-1216 (JCC)(IDD), 2014 WL 7157434, at *2 (E.D. Va. Dec. 15, 2014) (denying defendant's motion to dismiss because it raised question of fact as to plaintiff's work duties under Fair Labor Standards Act); *see also Townsend Commander Parkway, LLC v. Alliant Techsystems, Inc.*, 2:20-cv-75, 2020 WL 7001127, at *6 (E.D. Va. July 14, 2020) (denying defendant's motion to dismiss because issue of "[w]hether the claimed damage to the Premises exceeded reasonable wear and tear is an integral part of Tenant-Defendants' arguments").

Secondly – and more importantly – the merits of the contractual dispute between VIT and ILA are simply **not** at issue in this lawsuit. Again, nowhere in the Complaint does the ILA ask this Court to weigh the merits of the contractual dispute. Indeed, the ILA would like nothing better than to have its dispute with VIT fairly resolved pursuant to the extrajudicial contractual dispute resolution process. However, the ILA is entitled to have the dispute resolution proceed without the continual interference of a third-party public agency acting under the authority of state law.

**II.**

1003-656
153923

8

**THE ILA's COMPLAINT STATES A CLAIM THAT VPA IS INTERFERING IN A CONTRACT DISPUTE BETWEEN VIT AND THE ILA AND, AS SUCH, ITS CONDUCT IS PREEMPTED BY THE NLRA**

VIT's first legal argument is against a straw man. VIT argues that "[t]his court is not the proper forum to litigate VIT's compliance with the Master Contract" and that "Section 301 requires this dispute to proceed through the Master Contract's grievance and arbitration process" (Def. Br., p. 9). But VIT deliberately misunderstands the ILA's Complaint by attempting to recast it as one for breach of contract; however, the ILA's Complaint contains no breach of contract claim, and it does **not** ask this Court to enforce any contractual provision or award any contractual damages. Instead, the ILA is simply asking this Court to direct VPA to refrain from its ongoing interference in collective bargaining by unilaterally controlling the terms and conditions of employment that ought to be subject to collective bargaining with the ILA's actual employer.

It is undisputed that the Master Contract has a detailed grievance and arbitration procedure for resolving any type of dispute that might arise under it, including a very specific procedure for disputes involving automated new technology. Both the ILA and signatory employers, such as VIT, are legally bound to use the contractual dispute resolution procedure in lieu of proceeding in federal court. Indeed, the ILA's Master Contract covers employment at marine terminals from Maine to Texas, and the Master Contract dispute resolution procedure works in every port, except Virginia. That is because Virginia is the only port where a state-created agency is actively working on behalf of and with management against labor, upsetting the power dynamic envisioned and established by the NLRA.

The NLRA recognizes a federal right for the parties to engage in collective bargaining to resolve any and all disputes "free from governmental interference." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 364 (4th Cir. 1991) (citing *Golden State Transit Corp. v. City of Los*

*Angeles*, 475 U.S. 608 (1986)) (*Golden State I*). "Free collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA. Even though agreement is sometimes impossible, government may not step in and become a party to the negotiations." *Golden State*, 475 U.S. at 619 (citations omitted).

As a result, any state law or state action that interferes in collective bargaining is preempted by the NLRA under a doctrine, known as "*Machinists*" preemption, because it was first enunciated by the Supreme Court in *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Emp. Relations Comm'n,* 427 U.S. 132 (1976) (The Supreme Court held that NLRA preempted Wisconsin state agency from inserting itself into the middle of a labor dispute).

Here, the ILA's Complaint alleges detailed facts showing that Defendant VPA, a public agency, created by Virginia law and acting pursuant to the authority of state law, has repeatedly and persistently inserted itself into an ongoing contractual dispute between VIT and the ILA:

> For example, following the ratification and execution of the current Master Contract, VPA employees have been attending bargaining sessions between the ILA and VIT, even though they are not signatories to any collective bargaining agreement with the ILA or its local affiliates.

> When ILA representatives have confronted VPA representatives about their presence at collective bargaining sessions, they respond that they are representing VIT and are currently "on loan" from VPA for purposes of bargaining.

> This creates inequitable bargaining power and leaves the ILA at a disadvantage when it comes to negotiating the terms and conditions of employment at the Port of Virginia.

> This also upsets the notion that a signatory to a collective bargaining agreement assumes that relations between labor and management will remain free and clear from the interference or influence of third parties.

1003-656
153923

The allegations show that VPA has put its finger on the scale to upset the balance of power between VIT and VPA.  This conduct is precisely the sort of state-sponsored "governmental interference" that is prohibited and preempted by the NLRA.

Thus, contrary to VIT's contention, the "central allegation" in this Complaint is **not** any breach of contract that could be resolved pursuant to the collective bargaining process.  The "central allegation" is that VIT and VPA are using their public/private status to take advantage of the collective bargaining process.  Specifically, the acquisition and implementation of new technology is controlled by VPA, ostensibly without any knowledge or input from VIT, so that both defendants can avoid the contractual rules that VIT signed off on.  *See* Compl., ¶ 75.  Thus, the very grievance procedure that VIT invokes is stymied because the public part of the Port of Virginia is not bound by the Master Contract's terms.  Similarly, because VPA is a public entity, it is not considered an "employer" under the NLRA and, therefore, the NLRB has no jurisdiction. This allows VIT to use its public alter ego in a way that would otherwise be an unfair labor practice under the NLRA if VPA was a private corporation.

### III.

### VIT IS A NECESSARY PARTY

The ILA did not name VIT in its original lawsuit because it believed that the Master Contract's dispute resolution procedure could be made to work if only VPA was simply prevented from interfering in the collective bargaining process. At that time, VPA disagreed with this approach and argued vehemently – and ultimately successfully – that VIT was a necessary party to the lawsuit.  Specifically, VPA argued, "It is unclear how the Court could grant the relief the

1003-656
153923                                              11

ILA requests without prejudicing VIT . . .   not joining VIT here could also lead to parallel or subsequent litigation, all of which could produce incomplete, inconsistent, and inefficient settlement of this dispute." *Int'l Longshoremen's Ass'n v. Virginia Port Auth.*, 2:25-cv-523 (E.D. Va. 2025), ECF No. 14, p. 24.

As already noted, this Court agreed with VPA and clearly ruled that VIT was a necessary party:

> [T]he Court finds that the declaration sought would not provide constitutionally adequate redress because ILA has not included the proper defendant in the lawsuit.  ILA asks for a judgment that the defendants' attempts to intervene with the Master Contract executed between ILA and VIT are preempted by federal labor law.  But even if the Court chose to issue such a declaration, it would only bind these defendants – it would have no preclusive effect on VIT, the party with whom ILA has contracted because VIT has not been named as a party in this action.

Opinion & Order, ECF No. 41, p.12.

In compliance with this Court's Opinion and Order, the ILA has now added VIT as a defendant, because its appearance is necessary to afford the ILA complete relief and so that VIT is not prejudiced by its absence.  In fact, upon review, this appears to be the usual practice in lawsuits to vindicate NLRA preemption: both the state actor and the opposing bargaining party are named as defendants, or the opposing bargaining party is allowed to intervene.  *See, e.g., 520 South Michigan Ave. Associates, Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008) (Labor union permitted to intervene); *U.S. Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1081 (9th Cir. 2006) (various labor unions permitted to intervene); *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1409 (9th Cir. 1996) (labor union permitted to intervene); *Oil, Chem. and Atomic Workers Int'l Union, Local 5-283 v. Arkansas Louisiana Gas Co.*, 332 F.2d 64, 65 (10th Cir. 1964) (union permitted to intervene).

1003-656
153923

12

VIT also argues that Rule 19 alone does not create a cause of action.  *See* Def. Br., p. 26. No one ever said that it did.  The ILA has brought a claim against both defendants under the Declaratory Judgment Act, which specifies that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201.  The ILA has asked this Court to declare the "rights and legal relations" of the parties in light of NLRA preemption, given the fact a state-created entity is interfering with an ongoing labor dispute between VIT and the ILA, thereby destroying "the balance of power [between management and labor] designed by Congress."  *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619 (1986).  The Supreme Court has specified that an action for declaratory and injunctive relief is the proper method for plaintiffs to vindicate NLRA preemption claims.  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 119 (1989).

VIT argues that it has no control over VPA's various decisions to automate longshore work in the Port of Virginia and, therefore, VIT is simply along for the ride.  But, even if it is true that VPA keeps VIT completely in the dark about major expenditures in furtherance of port automation, VIT is still a beneficiary of VPA's automation campaign, and the workers who the ILA represents are the victims.

## A.  If VPA was subject to the NLRA, VIT and VPA Would Constitute a "Single Employer"

However, according to the Complaint's allegations, VIT is not being kept completely in the dark.  The Complaint alleges upon information and belief that the two entities are operating in concert.  This is important because, if VPA were a private actor, the ILA would have the

1003-656
153923                                                    13

opportunity to show that the VPA and VIT constitute a "single employer" or "alter egos," thereby allowing the ILA to enforce the obligations of the Master Contract against VPA.

VIT says these arguments should be made to the NLRB, but VIT is being exceptionally disingenuous. Both defendants are well aware that the NLRB has no jurisdiction over VPA as public employer. However, VIT is correct that both the NLRB and federal district courts have frequently dealt with situations where employment conditions are being altered by a non-signatory affiliate of the signatory employer. In such a situation where two entities act in concert to operate a workplace, the Board and the courts review several non-dispositive factors to determine whether the two entities are a "single employer," such as "interrelation of operations, common management, centralized control of labor relations[,] and common ownership." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (per curiam) (quotation marks omitted). "[W]hen one entity is a wholly owned subsidiary of another entity, common ownership is established." *NLRB v. Bannum Place of Saginaw, LLC*, 97 F.4th 351, 359-360 (6th Cir. 2024). "Common management can be demonstrated by 'substantial overlap in management and officers of the Respondents.'" *Id.* at 360 (*quoting NLRB v. Palmer Donavin Mfg. Co.*, 369 F.3d 954 (6th Cir. 2004)). To analyze whether separate entities have centralized control of labor relations, courts have considered whether one entity had hiring and firing power over the other entity's employees, whether the entities had conjoined payrolls, and whether they shared personnel policies. *See Bannum*, 97 F.4th at 360 (internal citations omitted). In *Palmer Donavin*, the Sixth Circuit held that substantial evidence supported a finding that two entities had interrelated operations when the two entities "operate[d] from the same facility, ha[d] the same health, life insurance and profit-sharing plans, use[d] the same payroll system, enjoy[ed] the same work holidays, and the

1003-656
153923

14

Respondents' employees occasionally fill[ed] in for each other."  369 F.3d at 957.  These are all questions of fact.

### B.  If VPA was a private entity, it could be construed as VIT's alter ego under the NLRA

Alter ego status "provides an[other] analytical hook to bind a non-signatory to a [CBA]." *Truck Drivers Local Union No. 807 v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991); *see Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004) (per curiam).  The alter ego doctrine, like the single employer doctrine, involves a flexible test that considers whether "two enterprises have substantially identical management, business purpose[s], operation[s], equipment, customers, supervision, and ownership." *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (quotation marks omitted). "The focus of the alter ego doctrine . . . is on the existence of a disguised continuance or an attempt to avoid the obligations of a [CBA] through a sham transaction or technical change in operations." *Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 748 (quotation marks omitted). "[A]nti-union animus or an intent to evade union obligations" is "germane" to the analysis, but not necessary.  *UNITE HERE*, 629 F.3d at 288 (quotation marks omitted).  Again, these are all questions of fact.

VIT/VPA could fit either category if VIT/VPA was a private company subject to the NLRA. In its Complaint, the ILA alleges that "VPA created VIT specifically to administer the daily operations of the marine terminals at the Port of Virginia.  The creation of VIT was deemed necessary under state law because Section 40.1-57.2 of the Virginia Code prohibits state agencies from recognizing 'any labor union or other employee association as a bargaining agent of any public officers or employees, or to collectively bargain or enter into any collective bargaining contract with any such union or association or its agents.'"  Compl., ¶ 19 (*quoting* Va. Code § 40.1-

1003-656
153923

57.2). "VPA owns and, through VIT, operates four general cargo facilities" in the Port of Virginia. *Id.*, ¶ 15. However, "97% of VPA's operating revenue originates from VIT" which "amounts to nearly $800 million. . . ." *Id.*, ¶ 13. "VPA and VIT are parties to an Operating Agreement between the two entities, which gives VPA a significant amount of control over all aspects of operations at the Port of Virginia." *Id.*, ¶ 16. "According to the Operating Agreement, VPA's CEO and Executive Director may appoint and remove at any time, with or without cause, VIT's Chief Operations Officer ('COO') and Chief Sales Officer, as well as set their respective compensation." *Id.*, ¶ 17.

As further evidence of the common management and interrelation of operations between the two entities, "VIT's COO and Chief Sales Officer are required to report directly to VPA's CEO and Executive Director regarding port management operations." *Id.*, ¶ 18. For example, during contract negotiations with the ILA, former VPA CEO and Executive Director "Stephen Edwards collaborated with representatives of VIT regarding the terms and conditions of employment at the Port of Virginia to prepare for collective bargaining negotiations and, more specifically, directed VIT as to which positions it should be taking in the context of collective bargaining with the ILA, even though VPA is not a party to any collective bargaining agreement by virtue of Section 40.1-57.2 of the Virginia Code." *Id.*, ¶ 49. As a result of "this collaboration between VPA and VIT," there were "significant interruptions between the bargaining parties," leading to VIT COO Joseph Ruddy being "temporarily prohibited from participating in bargaining due to engaging in conduct adverse to USMX's bargaining." *Id.*, ¶¶ 50-51. Nothing about these allegations is "conclusory," as VIT alleges. *See* Def. Br., p. 18.

Even after "the ratification and execution of the current Master Contract, VPA employees have been attending bargaining sessions between the ILA and VIT, even though they are not

signatories to any collective bargaining agreement with the ILA or its local affiliates." Compl., ¶ 83. "When ILA representatives have confronted VPA representatives about their presence at collective bargaining sessions, they respond that they are representing VIT and are currently 'on loan' from VPA for purposes of bargaining." *Id.*, ¶ 84. This is precisely analogous to *Palmer Donavin*, where employees filled in for each other. *See Palmer Donavin*, 369 F.3d 954, 957.

Together, VPA and VIT have collectively used state law and VPA's "owner-operator model" – with VPA controlling "the day-to-day business of the marine cargo terminals in the Port of Virginia . . . through . . . VIT" (*id.*, ¶ 11) – as pretext to infringe upon the ILA's federally protected collective bargaining rights. Based on this singular organizational structure and collective action – unlike "the vast majority of ports in the United States" that "operate under a 'landlord model' in which the local port authority leases the marine terminal land to private stakeholders (*i.e.*, marine terminal operators ("MTOs")), who control the operations at the port" (*id.*, ¶ 12) – it is evident that VIT is merely VPA's puppet.

Therefore, the allegations set forth in the ILA's Complaint, which must be accepted as true for purposes of a Rule 12(b)(6) motion, raise significant issues that cannot be resolved at the pre-answer stage, namely, (i) whether VPA and VIT are truly separate and distinct entities as they indicate on paper, or whether their coordinated actions indicate that they are one in the same, at least from a labor relations standpoint.

Finally, it is clear that the NLRA-based remedy is not available against VPA. But by the same token, a state agency should not be allowed to upset the collective bargaining balance designed by Congress when a similarly situated private actor could not do the same. Accordingly, the proper remedy is to find that VIT and VPA's conduct is preempted by the NLRA, and to enjoin all future attempts to evade Congressional design.

**IV.**

**DECLARATORY AND INJUNCTIVE RELIEF IS THE APPROPRIATE REMEDY WHEN A STATE-BASED ENTITY HAS ENGAGED IN CONDUCT PREEMPTED BY THE NLRA**

VIT argues that the Norris-LaGuardia Act ("NLA") bars the ILA from obtaining an injunction in this matter. However, the actual caselaw undermines this argument. Declaratory and injunctive relief is the proper remedy sought and obtained by plaintiffs whenever action by a state or local entity is preempted by the NLRA. *See, e.g., Rum Creek*, 926 F.2d at 359 (declaratory and injunctive relief appropriate remedy where employer alleged actions of state police were preempted by NLRA); *see also Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 119 (1974) *(*injunctive relief against the New Jersey welfare administrators' making public funds available to labor union members engaged in the strike); *Casala, LLC v. Kotek,* 789 F.Supp.3d 1025, 1041 (D. Or., 2025) (State of Oregon had interfered with collective bargaining by upsetting "the balance of power designed by Congress;" declaratory and injunctive relief was proper).

The few courts that have considered the NLA in the context of NLRA preemption have noted that the interfering public entity, such as VPA here, are not sufficiently "interested" in the private labor dispute to have the NLA apply. *See, e.g., Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1411 (9th Cir. 1996) (City was not sufficiently "interested" in the labor dispute to come within the Norris-LaGuardia Act's prohibition on injunctions).

**The *Boys Market* exception applies here**

Moreover, even analyzing this lawsuit under Norris-LaGuardia jurisprudence, it is clear that this case falls under the "reverse" *Boys Market* exception to Norris-LaGuardia. The Complaint alleges that VPA and VIT's scheme is to acquire, customize, install, and implement automation as secretly as possible, and then present the new technology to the ILA as a *fait accompli*, rather than

engage in the collaborative bargaining process that was envisioned and negotiated by the bargaining parties in the Master Contract. In that regard, a court order prohibiting this scheme will require VIT and the ILA to actually bargain as intended by the Master Contract and to resolve any disputes through arbitration under that Contract without VPA interfering or upsetting the balance of power.

VIT contends that the NLA "forecloses the ILA's request for an injunction against VIT" (Def. Br., p. 22), but the Supreme Court in *Boys Markets, Inc. v. Retail Clerks Union, Local 770* carved out an exception that applies here. *See* 398 U.S. 235 (1970). In that case, the Supreme Court held that, because of the importance of arbitration as an instrument for resolving labor disputes, the NLA should not be construed as prohibiting the issuance of injunctions to preserve the status quo in labor disputes pending arbitration where there is a binding grievance procedure and arbitration agreement. *See id.* at 242. The Supreme Court in *Boys Market* held that a federal court may issue injunctive relief to protect the effectiveness of arbitration agreements:

> [T]he very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate.

*Boys Market*, 298 U.S. at 249.

Federal courts have issued "reverse" *Boys Market* injunctions where the union demonstrated that the employer action under challenge was subject to mandatory arbitration and would present the arbitrator with a *fait accompli* and deprive the union of an effective remedy in the event the arbitrator decided the grievance in the union's favor. *See, e.g., Columbia Local, Postal Workers v. Bolger*, 621 F.2d 615, 618 (4th Cir. 1980); *Lever Bros. Co. v. Int'l Chem. Workers, Local 217,* 554 F.2d 115 (4th Cir. 1976) (relocation of plant); *Teamsters, Local 71 v.*

1003-656
153923

19

*Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir. 1978)*, cert. denied*, 440 U.S. 929 (1979) (partial liquidation of business); *Panoramic Corp.*, *supra* (sale of corporate assets); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.*, 100 L.R.R.M. 2394, 2395 (D.D.C. 1978) (termination of business); *Bakery Drivers, Local 802 v. S.B. Thomas, Inc.*, 99 L.R.R.M. 2253 (E.D.N.Y. 1978) (subcontracting of union work); *Food Employees, Local 590 v. Nat. Tea Co.*, 346 F. Supp. 875 (W.D. Pa. 1972); *remanded without opinion*, 474 F.2d 1338 (3d Cir. 1972) (sale of business); *Tech., Office & Prof. Workers, Local 757 v. Budd Co.*, 345 F.Supp. 42 (E.D. Pa. 1972) (relocation of corporate headquarters).  For example, in *Lever Bros.*, the Fourth Circuit affirmed an injunction that restrained an employer, pending arbitration, from relocating its soap production operation from Baltimore, Maryland to Hammond, Indiana.  The Court concluded that to deny the injunction and permit the employer to complete the transfer before an arbitrator could decide the union's grievance would render the arbitral process a hollow formality because it could not possibly restore the parties to the *status quo ante*.  In *United Tech. Corp.*, the Second Circuit held that an injunction could properly issue requiring an employer to cease and desist from implementing a plan to transfer bargaining unit work out of state unless and until the employer made contractually required efforts to preserve the work within the bargaining unit.  230 F.3d 569 (2d Cir. 2000).  In *Teamsters Local 299 v. U.S. Truck Co. Holdings, Inc.*, a union sought to enjoin the defendant trucking company and its parent from closing a freight facility pending arbitration of several grievances regarding the closing.  87 F. Supp. 2d (E.D. Mich. 2000).  The court enjoined the defendants from liquidating the assets of the trucking company because such an action would compromise the arbitration process by rendering a later award meaningless.

Thus, VIT is categorically incorrect arguing that the threshold to enjoining conduct under the NLA "must be more than merely a breach of contract or tortious act" (Def. Br., p. 25 (citations

1003-656
153923

20

omitted)) and that "'unlawful acts' under the NLA are generally limited to "things akin to 'violence, intimidation, threats, vandalism, breach of the peace or criminal acts.'" *Id.* (citations omitted).

Here, in the event that an arbitrator awards money damages following the unilateral purchase, installation, and implementation of job-reducing technology in contravention of the Master Contract, such award will not restore the ILA to the status quo. Therefore, the ILA seeks an injunction enjoining any additional unilateral purchases, installation, and implementation of job-reducing automated technology in contravention of the Master Contract and, accordingly, to preserve its federally protected collective bargaining rights.

To the extent that VIT also argues on behalf of its co-defendant VPA that "[t]he ILA's lack of contractual remedies against the Port Authority does not change [the] conclusion" (Def. Br., p. 14) that the Court will be required "to interpret the Master Contract," which "falls directly within Section 301's preemptive scope" (Def. Br., p. 13-14), even "where a claim against a non-signatory to a collective bargaining agreement requires interpretation of the collective bargaining agreement" (Def. Br., p. 14), the ILA reserves its right to respond to this argument in full in its opposition to VPA's Rule 12(b)(6) motion.

VIT relies on *United Mine Workers v. Covenant Coal Corp.*, but that case is readily distinguishable from the instant matter because the ILA does not "retain[] the right to proceed against [the non-signatory] by means of an unfair labor practice charge before the National Labor Relations Board." 977 F.2d 895, 899-900 (4th Cir. 1992). As the ILA acknowledged in its Complaint, "there is no alternative remedy to prevent this type of blatant interference because the NLRB does not have jurisdiction over public employers" (Compl., ¶ 19), such as VPA, and indeed VIT concedes as much in its brief. If, for example, VPA was a private corporation, the ILA would

1003-656
153923                                      21

have brought this matter before the NLRB, which would almost certainly rule that, together, the two entities are acting as a single employer or that the signatory is the alter ego of the non-signatory and, accordingly, bind both entities.

The ILA has no real remedy under the Master Contract either because – at least according to the representations by VIT representatives Zachary Clark and Kyle Bassham – VIT does "not have any control over the acquisition, installation, and/or implementation of new technology at the Port of Virginia." *Id.*, ¶ 67. The ILA will remain without an adequate remedy at law, unless and until this Court orders VPA to cease and desist from exercising any control over the terms and conditions of employment governed by the Master Contract, thereby using its status as a public entity to interfere with the ILA's federally protected bargaining rights.

**<u>This Matter is Ripe for Adjudication</u>**

This Court previously "found that ILA sufficiently pleaded an injury-in-fact through its allegations regarding the purchase of the RMG cranes" (Opinion & Order, ECF No. 41, p. 16) but did not claim "that VPA or VIT have plans to purchase more types of new technology in violation of the terms of the Master Contract, or that there is any reason to believe such conduct will transpire, aside from the fact that it allegedly happened once." *Id.* at p. 15. Further, this Court stated that "this claim, coupled with the relief sought, is not ripe . . . until ILA can plead facts to show future injury is not 'wholly speculative.'" *Id.* at p. 17. The ILA has now added the requested by the Court:

> ¶77.    In addition to the new technology already installed by VPA, VPA has plans to acquire, install, and implement at least eighteen (18) more semi-automated stacking cranes in 2027. According to the Port of Virginia's website, "[t]he North Berth project will be completed in two phases with 18 cranes set for delivery during each construction phase; the first group . . . in mid-2025 and the second is set for mid-2027. The value of the purchase is nearly $150 million."

1003-656
153923

22

https://www.portofvirginia.com/who-we-are/newsroom/virginia-moves-forward-with-purchase-of-new-ascs-for-north-berth-modernization-project/.

¶80.    Furthermore, the VPA's Master Plan envisions continued expansion of the Port onto Craney's Island in the coming decades. https://www.portofvirginia.com/wp-content/uploads/2023/09/2021-Master-Plan-Executive-Summary-2.pdf. It is the belief of the ILA and the ILA locals that Defendants will conspire and collaborate to avoid VIT's contractual bargaining obligations for the future expansion onto Craney's Island, unless and until this Court grants the declaratory and injunctive relief requested by the Plaintiff.

¶81    Also, even without expansion of the port's physical footprint, the Port of Virginia will regularly upgrade equipment and technology in the coming years.  Recently, there have been increasing attempts to incorporate artificial intelligence in every software update in every port around the world. . . .

VPA's "Master Plan" includes the further expansion of Norfolk International Terminals ("NIT") and adding "semi-automated stacks to the North yard to expand capacity, and optimize rail operations through implementing [cantilever rail-mounted gantry ('CRMG')] technology," which allows the Port of Virginia to operate with limited human intervention.  *See* https://www.portofvirginia.com/wp-content/uploads/2023/09/2021-Master-Plan-Executive-Summary-2.pdf, *supra*.

VIT feigns ignorance (again) and argues that the "press release was from three years ago, does not involve or mention VIT, and speaks only to the Port Authority's prior purchasing decisions, not its future plans" (Def. Br., p. 17) even though the Master Plan discusses the intent to install 18 more RMG cranes by mid-2027, and strategizes increased automation over the next 40 years through 2065.  Ironically, by pointing out that the Master Plan does not even mention VIT, VIT concedes that it has handed over complete control over technology and automation to VPA, even though VIT, as the contractual employer, has the duty to negotiate with the ILA about

1003-656
153923                                    23

how it will adopt automation to replace ILA jobs.  In addition, despite its contention that "VPA's alleged expansion plans in the 'coming decades' are even more speculative" (Def. Br., pp. 17-18), this is not a one-time transaction, as port development and labor relations are each ongoing endeavors and, regardless of the specifics, the parties know without speculating that any new technology that increases automation is subject to bargaining pursuant to the Master Contract.  The ILA does not need to wait until more new technology turns up on the terminal unannounced as a *fait accompli*.  The ILA is entitled to act now to prevent that from happening in the future.  Without judicial intervention, the ILA is at risk of enduring another 40 years of VPA and VIT operating collectively to undermine its federally protected collective bargaining rights by way of state law.

## CONCLUSION

For the foregoing reasons, Plaintiff International Longshoremen's Association respectfully requests that this Court deny Defendants' motion to dismiss in its entirety and for such other relief as this Court deems just and proper.

Dated:   Alexandria, VA
         July 6, 2026

Respectfully submitted,

*/s/ Justin P. Keating*
Justin P. Keating (VA Bar 75880)
BEINS, AXELROD & KEATING, P.C.
215 N. Payne St., Suite 129
Alexandria, VA 22314
703.966.3193
jkeating@beinsaxelrod.com

1003-656
153923

24

*s/ John P. Sheridan*
John P. Sheridan (*Pro Hac Vice*)
Brian A. Jasinski (*Pro Hac Vice*)
39 Broadway, 34th Floor
New York, NY 10006
(212) 425-3240
JSheridan@mmmpc.com
BJasinski@mmmpc.com


**COUNSEL FOR THE PLAINTIFF INTERNATIONAL LONGSHOREMEN'S ASSOCIATION**

**CERTIFICATE OF SERVICE**

I certify that on July 6, 2026, I electronically filed the foregoing document with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to all parties by

electronically serving their counsel of record.


_____/s/_____

Justin P. Keating

1003-656
153923                                    26