**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | |
|---|---|
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA PORT AUTHORITY, *et al.*,<br><br>Defendants. | Case No. 2:26-cv-366 |

**OPINION & ORDER**

Plaintiff International Longshoremen's Association ("ILA") claims that Defendants Virginia Port Authority ("VPA"), Virginia International Terminals, LLC ("VIT"), and Sarah McCoy, CEO and Executive Director of the VPA, are conspiring to defeat the collective bargaining procedures that ILA and VIT agreed must precede the installation of new technologies at the Port of Virginia. The defendants move to dismiss ILA's complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF Nos. 17 (VIT's motion), 23 (VPA's and McCoy's motion).[1] While ILA plausibly alleges facts that are enough for it to have standing, those same facts do not produce a ripe claim that the Court can resolve. Therefore, for the reasons stated herein, the motions to dismiss will be granted, and the complaint will be dismissed without prejudice.

[1] The Court has considered the arguments in the parties' briefing and concluded there is no need to hold a hearing on the motions. *See* Fed. R. Civ. P. 78(b); E.D. Va. Civ. R. 7(J).

## I. BACKGROUND

At this stage, the Court assumes that the facts alleged in the complaint are true. VPA, a statutorily created public instrumentality of the Commonwealth of Virginia, is using its Virginia-proscribed authority to interfere with a "private-sector collective bargaining relationship" through a separate, independent legal entity known as Virginia International Terminals, LLC ("VIT"), whose sole member is VPA. ECF No. 1 ¶ 74. VPA created VIT "specifically to administer the daily operations of the marine terminals at the Port of Virginia," which are owned by VPA. *Id.* ¶ 19. VIT was created because Virginia law prohibits state agencies from recognizing labor unions as bargaining agents for employees and from entering into any collective bargaining agreement with a union. *Id.* Thus, VPA established VIT because it needed a marine terminal operator that could employ members of a labor union as the majority of marine cargo is shipped to the East Coast by international cargo carriers who have collective bargaining relationships with the coastwide bargaining unit that ILA represents. *Id.* ¶ 20.

VIT—not VPA—serves as the record employer for longshore and maritime workers that are members of the coastwide bargaining unit ILA represents. ECF No. 1 ¶ 21. VIT is also an employer-member of a multi-employer management group, United States Maritime Alliance Ltd. ("USMX"), which acts on behalf of employers to negotiate and administer the coastwide collective bargaining agreement, known as the "Master Contract." *Id.* ¶¶ 24–25. The Master Contract "governs the terms and conditions of employment for longshore workers and related crafts in the coastwide

bargaining unit" and covers topics such as wages, hours, benefits, and workplace safety. *Id.* ¶¶ 25–26. VIT is a signatory to the Master Contract, and it participated in the negotiations for the current Master Contract, which was signed on March 11, 2025, and will remain in effect through September 30, 2030. *Id.* ¶¶ 27, 55–56.

Article XI, Section 1, of the Master Contract provides, in pertinent part, that:

> (a) Management in partnership with the ILA shall protect the Master Contract workforce for the term of this Master Contract while improving safety, productivity, efficiency and capacity on the terminals.
>
> . . .
>
> (c) No new technology will be implemented until the parties mutually agree to manning levels and workforce protections or upon completion of the below procedure listed in Section 4 of this Article XI.
>
> . . .
>
> (e) The parties acknowledge that prior to the purchase of any equipment, software, or hardware that is subject to this Article, the requirements of Section 4 of this Article XI must be completed.

ECF No. 1 ¶ 58. Article XI, Section 4, of the Master Contract "establishes a specific and thorough review process prior to the implementation of new technology, beginning with an employer notifying the Co-Chairmen of the New Technology Committee in writing of the employer's intentions for implementing new technology."

*Id.* ¶ 37. Both the implementing employer and the local ILA union shall then negotiate before the technology is implemented. *Id.*

In April 2025, ILA members observed that newly-purchased semi-automated rail-mounted gantry ("RMG") cranes were being set up and installed by VIT at the Norfolk International Terminal, without any prior notice to ILA. ECF No. 1 ¶ 64. ILA confronted VIT about the cranes, and VIT maintained that the cranes had been purchased by VPA, not VIT, and that because VPA was not a party to the Master Contract, it had no obligation to abide by the Master Contract's language. *Id.* ¶¶ 67–68.

After that incident, ILA filed a lawsuit against VPA and its then-CEO and Executive Director Stephen Edwards claiming that the defendants' efforts to interfere with the Master Contract were preempted by the National Labor Relations Act ("NLRA"). *Int'l Longshoremen's Assoc. v. Va. Port Auth. et al.*, No. 2:25-cv-523, ECF No. 1. That action sought declaratory and injunctive relief. *Id.* VPA and Edwards moved to dismiss under Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(7). No. 2:25-cv-523, ECF No. 13. This Court granted their motion after determining that ILA lacked standing and that its claims were not ripe. No. 2:25-cv-523, ECF No. 41.

Then, roughly two months later, ILA commenced this lawsuit and added VIT as a party. ECF No. 1. In its new complaint, ILA alleges additional facts regarding what it perceives as a significant possibility that VPA and VIT will, in the short- and long-term, continue to unlawfully interfere with the Master Contract. *See id.* ¶¶ 75–81. As in its first lawsuit, ILA seeks a declaratory judgment stating that the NLRA

preempts VIT and VPA from circumventing VIT's obligations under the Master Contract, as well as a permanent injunction preventing the defendants from interfering with it. *Id.* ¶¶ 93–101, 114–17. For the first time, ILA also brings two tortious interference claims against VPA and McCoy, alleging unlawful interference with its contract with VIT. *Id.* ¶¶ 102–13.

In their motions to dismiss, the defendants assert (1) that the Court lacks subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on multiple grounds, including sovereign immunity, standing, and ripeness; and (2) that the complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6). *See* ECF Nos. 18 (VIT memorandum), 24 (VPA memorandum).

## II. LEGAL STANDARDS

### A. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the court's subject matter jurisdiction. Such a motion can proceed in two ways: a "factual challenge," where the movant asserts that the complaint's subject matter jurisdiction allegations are untrue, or a "facial challenge," where the movant asserts that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (citation and quotation marks omitted). In a facial challenge, the "facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a factual challenge, the court may go beyond the allegations of the complaint and decide

disputed issues of fact without converting the motion to a summary judgment proceeding. *Id.*

### B. Article III Standing

To plead standing, a plaintiff must plausibly allege that they have "(1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (punctuation omitted); *Fed. Trade Comm'n v. Ross*, 74 F.4th 186, 192 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024).

### C. Ripeness

Ripeness is a "justiciability doctrine [that] determines when a case . . . is fit for federal judicial review." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019). The doctrine of ripeness "originate[s] from . . . Article III" of the Constitution. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (citation and quotation marks omitted). "The burden of proving ripeness falls on the party bringing suit." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted). A claim is ripe for adjudication "when the action in controversy is final and not dependent on future uncertainties." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014) (citation and quotation marks omitted). A claim is not ripe when "the plaintiff has not yet suffered injury and any future impact remains wholly speculative," or when "an injury is contingent upon a decision to be made by a third party that has not yet acted." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (citation and quotation marks omitted). When assessing ripeness, courts must consider the "hardship to the

parties" and "the cost" of "delaying judicial review." *Miller*, 462 F.3d at 319 (citation and quotation marks omitted).

### D. Declaratory Judgment Actions

The Declaratory Judgment Act ("DJA") provides that federal courts "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The "declaration shall have the force and effect of a final judgment." *Id.* District courts must conduct two inquiries when deciding whether jurisdiction pursuant to the DJA exists: a constitutional inquiry and a prudential inquiry. *White v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.2d 165, 167 (4th Cir. 1990). First, "the dispute must be a 'case or controversy' within the confines of Article III of the United States Constitution—the 'constitutional' inquiry." *Id.* Second, "the trial court, in its discretion, must be satisfied that declaratory relief is appropriate—the 'prudential' inquiry." *Id.*

## III. ANALYSIS

ILA asserts that the defendants' efforts to "circumvent[] VIT's contractual obligations and interfere[] with the ILA's collective bargaining rights" are preempted by the NLRA. ECF No. 1 ¶ 101. The defendants argue that the Court lacks subject matter jurisdiction to consider those claims because (1) ILA lacks standing to bring suit, (2) ILA's claims are not ripe, (3) ILA fails to allege an actual controversy between

the parties, and (4) sovereign immunity bars ILA's claims. *See* ECF Nos. 18, 24. As it did in ILA's prior lawsuit, the Court will address standing first.[2]

**A. Standing**

ILA has suffered an injury-in-fact that can be effectively redressed through declaratory and injunctive relief.

***i. Injury-in-Fact***

"[A] plaintiff must show that [they] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Beck*, 848 F.3d at 270 (citation and quotation marks omitted). That injury-in-fact must be "distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (cleaned up).

As in ILA's prior lawsuit, the Court finds that ILA has alleged an injury-in-fact. ILA alleges that in April 2025, RMG cranes were installed at Norfolk International Terminal without prior notice to the ILA. ECF No. 1 ¶ 64. ILA claims that this action violated the Master Contract, which required VIT to notify ILA before new technology was purchased so that negotiations related to that new technology

[2] The Court need not address the parties' arguments about sovereign immunity because dismissal is warranted on other grounds. *See* No. 2:25-cv-523, ECF No. 41 at 7 n.3 (applying same approach). Moreover, while the parties have briefed sovereign immunity once more in this case, the Court determines that it still lacks sufficient information to determine whether VPA operates independently from, or "as an arm of," the Commonwealth. *United States ex rel Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650–51 (4th Cir. 2015) (discussing fact-sensitive factors to evaluate entitlement to sovereign immunity); *see also Love v. Va. Port Auth.*, No. 2:16-cv-160, 2017 WL 10181010, at *7 (E.D. Va. Aug. 11, 2017) (declining to resolve some of these factors absent "further factual development via discovery" on a motion to dismiss).

could take place. *Id.* ¶¶ 63–64. Because ILA has alleged the invasion of a legally protected interest under the Master Contract, they have shown an injury-in-fact.

***ii. Redressability***

ILA must also show that the "exercise of the [C]ourt's remedial powers on their behalf" can redress the alleged injury. *Wells v. Johnson*, 150 F.4th 289, 298–99 (4th Cir. 2025) (citation omitted). Here, ILA requests two forms of relief: (1) a declaratory judgment that VPA's attempt to interfere with the collective bargaining process between VIT and ILA is preempted by the NLRA; and (2) a permanent injunction to prevent the defendants from interfering with collective bargaining or the administration of the Master Contract. ECF No. 1 ¶¶ 93–101, 114–17. Because of the new allegations it has added to its complaint, ILA adequately demonstrates that its injury-in-fact may be effectively redressed by both forms of relief.

*a. Declaratory relief*

In ILA's prior lawsuit, the Court concluded ILA did not have standing to obtain declaratory relief. No. 2:25-cv-523, ECF No. 41 at 12–15. The Court reached that conclusion because ILA had not included VIT as a defendant; as a result, any declaration the Court would issue could not actually bind the relevant parties. No. 2:25-cv-523, ECF No. 41 at 13 (quoting *Muskrat v. United States*, 219 U.S. 346, 362 (1911)). Moreover, in order for a declaratory judgment to provide redress, a plaintiff must offer a theory of how they would use that judgment either defensively as protection from "sufficiently definite risk of suffering penalty, liability or prosecution," or offensively by "offer[ing] reason to think the future suit where [they]

want[] to use the preclusion will come." *Wells*, 150 F.4th at 302–03 (citation and quotation marks omitted). The Court previously found that ILA had not adequately shown how it would use a declaration in either fashion in a future lawsuit. No. 2:25-cv-523, ECF No. 41 at 14.

ILA has addressed both shortcomings in its new complaint. First, ILA named VIT as a defendant. ECF No. 1 ¶ 4. So if the Court were to grant declaratory relief, the declaration would bind VIT—the actual party to the Master Contract. *Cf. Wells*, 150 F.4th at 304 (declaration sought would not provide constitutionally adequate redress where entity was not named in the lawsuit).

Second, ILA has demonstrated how it would use a declaration in a future lawsuit. ILA alleges wrongful conduct it believes VPA and VIT will engage in, namely "conspir[ing] and collaborat[ing] to avoid VIT's contractual bargaining obligations" as part of future technological installations undertaken pursuant to VPA's Master Plan, as well as for the second phase of the North Berth's crane installation. ECF No. 1 ¶¶ 79–80. ILA adequately pleads that it will use a declaration offensively against these actions when they occur, by alleging that defendants will continue their wrongful conduct until and unless the Court grants it declaratory relief to wield against them. *Id.* ¶ 81.[3] Given that the burden of showing offensive use of a declaration should be "easy to show" for a plaintiff, *Wells*, 150 F.4th at 303, the Court

[3] ILA does not appear to suggest that it faces any "risk of suffering penalty, liability, or prosecution" because of the defendants' actions. *Wells*, 150 F.4th at 302 (citation omitted). Therefore, the Court assumes that ILA does not intend to invoke a declaratory judgment defensively in future litigation.

is satisfied that these allegations suggest ILA's intent to use a declaration offensively in the potential future litigation of its choosing.

In sum, the declaration that ILA seeks "will bind the party [it] would sue" and there is "reason to think the future suit where [it] wants to use the preclusion will come." *Wells,* 150 F.4th at 303. Thus, ILA has shown that its claim for a declaratory judgment would provide effective redress that could warrant exercise of the Court's judicial power.

*b. Injunctive relief*

Similarly, the Court also concludes that ILA has pleaded sufficient facts to show that an injunction could provide adequate redress.

A plaintiff can still obtain injunctive relief prospectively when they have "good reason to think" that the injury will occur again soon. *Wells*, 150 F.4th at 300; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (injunctive relief only appropriate when there is a "sufficient likelihood" of being "wronged in a similar way"); *Kenny v. Wilson*, 885 F.3d 280, 290 (4th Cir. 2018) (plaintiff alleging "that there will be future encounters" of a potentially suspect nature makes a future injury sufficiently concrete); *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 245 (4th Cir. 2026) (cleaned up) ("A plaintiff who suffered past harm can demonstrate standing to pursue injunctive relief only if [they] face[] a real or immediate threat of being wronged again.") (citation and quotation marks omitted).

Previously, the Court concluded that ILA had not met its burden to show that real or immediate threat of "future encounters, in large part because ILA did not

allege that either VPA or VIT planned to purchase additional types of new technology in violation of the Master Contract. No. 2:25-cv-523, ECF No. 41 at 15. Nor did ILA show any reason to believe the conduct would occur again, aside from the fact that it allegedly happened once when VPA and VIT installed the first wave of cranes. No. 2:25-cv-523, ECF No. 41 at 15 (citing *Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("[T]he past is relevant only insofar as it is a launching pad for a showing of imminent future injury.")).

In this complaint, however, ILA does allege that VPA and VIT will purchase more types of new technology in violation of the Master Contract. Specifically, ILA references the VPA's Master Plan, which contemplates the expansion of the Port onto Craney's Island and the purchase of several new forms of technology. ECF No. 1 ¶ 80.[4] At this stage of litigation, the Court must draw all reasonable factual inferences in favor of ILA, including that these expansions may occur and that VPA and VIT will evade the collective bargaining obligations guaranteed by the Master Contract. That is enough to conclude that a recurrence of VPA's and VIT's allegedly unlawful conduct is of a "sufficient likelihood" such that granting injunctive relief could redress possible injuries related to that conduct. *Kenny*, 885 F.3d at 289 (citation omitted); *see also*

[4] ILA references the VPA's Master Plan through a hyperlink to the Port of Virginia's website, which links to a PDF attachment of the Master Plan. *See* ECF No. 1 ¶ 80. It also attaches the Master Plan to one of its other pleadings. *See* ECF 33-1. A court may consider a document attached to the motion to dismiss without converting the motion into one for summary judgment, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Because ILA's complaint refers to exhibits that are integral to the claims therein, and the defendants do not contend the exhibits are inauthentic, the Court will consider them.

*Carolina Youth Action Proj. v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) ("Even those who have suffered a past harm . . . cannot seek injunctive relief . . . unless a recurrence is likely.").

Because ILA pleads facts showing that the kinds of harm alleged in its complaint are sufficiently likely to recur given VPA's planned expansions and technological advancements, the Court finds the ILA has standing to pursue injunctive relief.[5]

**B. Ripeness**

However, the fact that ILA has standing to sue does not entitle it to a judicial determination. The Court still must determine whether its claims are ripe now. *See Doe*, 713 F.3d at 758 (claims should be dismissed as unripe "if the plaintiff has not yet suffered injury and any future impact remains wholly speculative") (citation and quotation marks omitted); *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (claim not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (citation and quotation marks omitted); *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013) (claim not ripe if it "relies on a highly attenuated chain of possibilities"). As the plaintiff, ILA has the burden to show that its claims are ripe. *Doe*, 713 F.3d at 758 (citation omitted).

---

[5] The parties do not discuss causation, which is also a requirement for Article III standing. However, causation and redressability are often two "sides of the same coin," because "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (citation and quotation marks omitted). Therefore, the Court determines that ILA also satisfies the causation requirement.

In its previous Opinion and Order, the Court found that ILA's claims were not ripe because ILA had not pleaded facts to show that its future injury was not wholly speculative.[6] No. 2:25-cv-523, ECF No. 41 at 16–17. ILA avers new facts in this complaint to address that shortcoming: Namely, ILA points to VPA's 2026 Master Plan and its proposals to install new technologies at the Port of Virginia over the next several decades. *See* ECF No. 1 ¶ 80. Specifically, ILA claims that VPA "envisions continued expansion of the Port onto Craney's Island in the coming decades," during which it will "conspire and collaborate" with VIT "to avoid VIT's contractual bargaining obligations" for that expansion. *Id.* Moreover, ILA alleges that "the Port of Virginia will regularly upgrade equipment and technology in the coming years" independent of the Port's physical expansion, including with the increased use of technologies involving artificial intelligence, which ILA sees "absolutely no reason to believe . . . will slow down or cease any time soon." *Id.* ¶ 81.

Despite these new factual allegations, ILA's claims remain unripe. The Master Plan does contain proposals for the installation of new technologies, but those plans hinge on partnerships, funding structures, and promotions occurring well into the future—sometimes several decades away. *See* ECF No. 1 ¶ 80 (referencing the Master Plan, which uses aspirational terms like "partnering," "advocating," and "positioning"

[6] This Court previously determined that ILA's allegation regarding the April 2025 installation of cranes could not support a ripe claim because, "[a]lthough . . . ILA sufficiently pleaded an injury-in-fact through its allegations regarding the purchase of the RMG cranes . . . this claim, coupled with the relief sought, is not ripe until the defendants take further action that interferes with the contractual relationship, or at least until ILA can plead facts to show future injury is not 'wholly speculative.'" No. 2:25-cv-523, ECF No. 41 at 16–17.

to characterize key elements of the port's near-term strategy and acquisitions of new technology). In the same vein, ILA alleges that VPA will continue to indefinitely incorporate artificial intelligence—and upgrade technology accordingly—but that too is an aspirational statement of future plans that does not support finding ripeness now. "Because there [are] many steps that would need to occur between the adoption of the [p]lan and any actual [] harm," ILA has "ample opportunity later to bring its legal challenge at a time when harm [is] more imminent and more certain." *Wild Va. v. Council on Environmental Quality*, 56 F.4th 281, 296 (4th Cir. 2022) (citation and quotation marks omitted).

Moreover, to the extent that ILA's claim instead focuses on the installation of 18 new cranes in mid-2027, that too is unripe. ILA alleges that it is "one [] year away from having another phase of job-reducing automated technology implemented without the opportunity to bargain for workforce protections." ECF No. 1 ¶¶ 77, 92. But litigating that claim would still require VIT or VPA to first interfere with the opportunity to bargain regarding the installation of those cranes, which necessarily "rests upon contingent future events that may not occur as anticipated." *South Carolina*, 912 F.3d at 730 (citation and quotation marks omitted); *see also* No. 2:25-cv-523, ECF No. 41 at 17–18. Indeed, VIT claims the parties are engaged in negotiations already regarding the installation of the cranes it purchased, and in the interim has not used them for cargo or terminal operations. ECF No. 18 at 6–8. That likewise counts against ripeness, for VIT may negotiate with ILA in the way the Master Contract requires—and that ILA's claim otherwise would "rest[] upon

contingent future events" that the Court cannot predict. *South Carolina*, 912 F.3d at 730.

Therefore, while the new factual allegations pleaded in ILA's complaint are enough to establish standing to sue to prevent future interference with its collective bargaining process with VIT, the claims are still not ripe for the Court's determination.[7] When deciding whether claims are ripe, the Court also must consider

---

[7] Because the Court concludes that ILA's claims are not ripe, dismissal is appropriate under Rule 12(b)(1). However, even if the Court could reach the merits of ILA's claims, it would likely still grant the defendants' motions to dismiss under Rule 12(b)(6).

Regarding Count I, the Court agrees with the defendants that ILA must show an underlying source of federal rights that justifies declaratory relief. *See* ECF Nos. 18 at 19, 24 at 12. ILA argues that the federal National Labor Relations Act preempts "any state law or state action that interferes in collective bargaining." ECF No. 28 at 10. But the theory of preemption it articulates under *Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132 (1976), requires that the activity, "whether of employer or employees, were not to be regulable by States any more than by the NLRB." *Id.* at 149. To that end, the question is whether a particular law results in the state "enter[ing] into the substantive aspects of the bargaining process to an extent Congress has not countenanced." *Id.* (citation and quotation marks omitted).

However, the actions that ILA claims are preempted have been undertaken pursuant to state statutes that largely have nothing to do with state labor regulation. *See, e.g.*, ECF No. 1 ¶ 100 (quoting Va. Code Ann. § 62.1-132.3, which is the enabling statute that allows the VPA to perform acts useful to develop or improve port-related commerce). ILA appears to assert that the enabling statute is *itself* the state law that interferes with collective bargaining rights. But the Court is not persuaded that *Machinists* preemption should apply, because port-related commerce is reasonably assumed to be an issue that is "regulable by States." *Machinists*, 427 U.S. at 149. And as a result, the complaint appears to lack an underlying basis for the declaratory judgment claim.

Counts II and III also do not appear to pass muster. Tortious interference claims in Virginia require an intentional interference inducing or causing a breach of a contract. *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). The Court notes that many courts have concluded that *any* state law claim requiring consideration of

possible "hardship to the parties" that would result from delaying judicial review. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir. 1997) (courts weigh if issues are "substantively definite enough to be fit for judicial decision" and whether "withholding court consideration" on those issues would cause hardship). Hardship to the parties is especially relevant when a plaintiff is "*presently*" facing some danger, risk, of invasion of a legally protected interest. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 199 (4th Cir. 2013) (emphasis in original); *see also Miller*, 462 F.3d at 321 (hardship existed where challenged action related to "immediate harm" to plaintiffs).

Here, ILA has not alleged that any defendant is threatening it with imminent harm. And it does not argue that it would suffer undue hardship if this action is dismissed. Therefore, the Court concludes that there remains no "immedia[te] . . . threat" of harm to ILA that would lend itself to a conclusion that its claims are ripe. *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 209 (4th Cir. 1992) (citation omitted).

---

whether an underlying collective bargaining agreement was breached is preempted by Section 301 of the Labor Management Relations Act. *See, e.g.*, *Freeman v. Duke Power Co.*, 114 Fed. App'x 526, 530–31 (4th Cir. 2004) (unpublished).

Finally, Count IV seeks injunctive relief, but "[a]n injunction is a form of remedy, not an independently cognizable cause of action." *Apex Adv. Tech. LLC v. RMSI Private Ltd.*, No. 1:21-cv-1400, 2022 WL 4826335, at *7 (E.D. Va. Sep. 30, 2022) (citation and quotation marks omitted).

## IV. CONCLUSION

The defendants' motions to dismiss (ECF Nos. 17, 23) are **GRANTED**.

Plaintiff International Longshoremen's Association's complaint is **DISMISSED WITHOUT PREJUDICE**.

The defendants' motion for a protective order staying all discovery (ECF No. 37) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

/s/ JKW

Jamar K. Walker
United States District Judge

Norfolk, Virginia
November 10, 2026